

NUMBER 13-09-00368-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF R.S., R.S. Jr., C.S., B.S., AND A.S., CHILDREN

**On appeal from the County Court at Law No. 5
of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Benavides and Vela
Memorandum Opinion by Chief Justice Valdez**

Following a bench trial, the trial court signed judgments terminating the parental rights of appellant, Jane,[1] the mother of R.S., R.S. Jr., C.S., B.S., and A.S.[2] In this accelerated appeal, Jane challenges the legal and factual sufficiency of the trial court's finding that termination of her parental rights is in the childrens' best interest. *See* TEX.

---

[1] To protect the mother's and children's privacy, we refer to the mother as Jane, a fictitious name, and the children by their initials. *See* TEX. FAM. CODE ANN. § 109.002(d) (Vernon 2008); TEX. R. APP. P. 9.8(b)(2).

[2] The trial court also terminated the parental rights of the children's alleged father as well as any unknown fathers. However, they are not parties to the appeal.

FAM. CODE ANN. § 161.001(2) (Vernon Supp. 2009).  We affirm.

## I. BACKGROUND

In December 2006, appellee, the Texas Department of Family and Protective Services ("the Department"), became involved with Jane's children when a report alleging physical neglect and neglectful supervision of R.S., R.S. Jr., C.S., and B.S. was filed.  The Department received a second referral in January 2007, when A.S. tested positive for cocaine at birth.  After further investigation, the Department asked Jane to voluntarily place the children with B.G., the children's maternal grandmother, and offered Jane family-based services.[3]

After Jane complied with some of the services, the Department allowed the children to return to her care.  On October 15, 2007, third and fourth referrals that alleged the physical and medical neglect of R.S. and R.S. Jr. were filed with the Department.  Jane subsequently tested positive for cocaine, and the Department filed suit to terminate her parental rights.  The children were temporarily placed with a foster family until January 2008, when they were again placed with B.G.  After B.G. suffered a heart attack in August 2008, the children were removed and placed with a foster family.

In April 2009, following a bench trial, the trial court signed an order terminating Jane's parental rights with respect to the children.  This accelerated appeal ensued.  *See* TEX. FAM. CODE ANN. § 109.002 (Vernon 2008); TEX. R. APP. P. 28.1.

## III. BEST INTEREST

In her sole issue, Jane challenges the legal and factual sufficiency of the trial court's finding that termination of her parental rights is in the children's best interest. *See*

---

[3] Testimony during the bench trial defined "family-based services" as a means of providing the parent with services such as parenting classes and substance abuse counseling.

TEX. FAM. CODE ANN. § 161.001(2).

## A. Standard of Review

To terminate parental rights, a trial court must find by clear and convincing evidence that the parent committed an act prohibited by section 161.001(1) of the family code and that termination is in the best interest of the child.[4]  *See id.* § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).  "Clear and convincing evidence" is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  TEX. FAM. CODE ANN. § 101.007 (Vernon 2008).  This intermediate standard falls between the preponderance of the evidence standard of civil proceedings and the reasonable doubt standard of criminal proceedings.  *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.–Fort Worth 2006, pet. denied).

In reviewing the legal sufficiency of the evidence supporting parental termination, we must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."  *In re J.L.*, 163 S.W.3d at 85.  We assume that the fact finder resolved any disputed facts in favor of its finding if a reasonable fact finder could have done so, and we disregard all evidence that a reasonable fact finder could have disbelieved.  *Id.*

---

[4] The trial court based termination of Jane's parental rights on the following findings:  (1) she knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children; (2) she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children; (3) she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children; (4) she constructively abandoned the children; (5) she used a controlled substance in a manner that endangered the health or safety of the children and failed to complete a court-ordered treatment program, or after completion of a program, continued to use a controlled substance; and (6) termination of the parent-child relationship is in the childrens' best interest.  *See* TEX. FAM. CODE ANN. § 161.001(1)(D)-(E), (1)(N)-(P), (2) (Vernon Supp. 2009).  On appeal, Jane challenges only the best interest finding.  *See id.* § 161.001(2).

3

However, we must also consider undisputed evidence, if any, that does not support the finding. *Id.* at 86.

In reviewing the evidence for factual sufficiency in parental termination cases, we must give due deference to the fact finder's findings and not supplant its judgment with our own. *In re H.R.M.,* 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a fact finder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001; *In re C.H.,* 89 S.W.3d 17, 26 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *In re H.R.M.,* 209 S.W.3d at 108.

## B. Applicable Law

When determining whether termination is in a child's best interest, the following list of factors should be considered: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the parties seeking custody; (5) the programs available to assist the parties seeking custody; (6) the plans for the child by the parties seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions committed by the parent which may indicate that the existing parent-child relationship is not proper; and (9) any excuse for the acts or omissions committed by the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not exhaustive, and there is no requirement that the Department prove all factors as a condition precedent to parental termination. *In re C.H.,* 89 S.W.3d at 27. In some cases,

4

undisputed evidence of just one factor may be sufficient to support a finding that termination is in the best interest of the child. *Id.* Furthermore, when the department or another government agency is the petitioner, subsection 263.307(b) of the Texas Family Code lists thirteen factors that the court should consider in determining whether a parent is "willing and able to provide the child with a safe environment."[5] *See* TEX. FAM. CODE ANN. § 263.307(b) (Vernon 2008). In our review of the trial court's termination order, we will likewise give consideration to these factors to the extent applicable. *See In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam); *In re S.N.*, 272 S.W.3d 45, 50-51 (Tex. App.–Waco 2008, no pet.); *see also In re H.M.P.*, No. 13-08-00643-CV, 2010 WL 40124, at *13 (Tex. App.–Corpus Christi Jan. 7, 2010, no pet. h.) (mem. op.) (considering the *Holley* factors as well as the factors listed in subsection 263.307(b) in determining whether

---

[5] The factors enumerated in section 263.307(b) include, among others, the following:

(1) the child's age and physical and mental vulnerabilities;

. . . .

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

. . . .

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

. . . .

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills . . . .

TEX. FAM. CODE ANN. § 263.307(b) (Vernon 2008).

termination was in the child's best interest).

**C.    Analysis**

    **1.    Desires of the children**

Kristen Pavelka, the Department caseworker assigned to Jane's case, testified that since the children have moved in with their foster family, Jane has appeared for only one scheduled visit. Pavelka stated that during the visit, "[t]he children were happy to see [Jane]." Pavelka also testified that although the children have stated that they miss Jane and "love her very much," R.S. and R.S. Jr. have stated that they understand that with their foster parents they are "safe and . . . clean" and that their needs are being met.

    **2.    Present and future physical and emotional needs of the children; present and future emotional and physical danger to the children; the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper; excuse for the acts or omissions committed by the parent**

"[A] fact finder may infer that past conduct endangering the well being of a child may recur in the future if the child is returned to the parent." *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.–Austin 2004, pet. denied) (citing *In re D.L.N.*, 958 S.W.2d 934, 941 (Tex. App.–Waco 1997, pet. denied), *disapproved on other grounds by In re J.F.C.*, 96 S.W.3d 256, 267 (Tex. 2002) and *In re C.H.*, 89 S.W.3d at 26); *see also In re E.A.*, No. 13-06-503-CV, 2007 WL 2471459, at *8 (Tex. App.–Corpus Christi Aug. 31, 2007, no pet.) (mem. op.) (holding that where "the Department presented evidence establishing appellant's history of unstable housing, unstable employment, unstable relationships, mental health issues, and drug usage," the trial court "could have inferred that the risk factors would continue to be present thus endangering the children's well-being in the future if the children are returned to appellant").

In December 2006, the Department received a report that alleged physical neglect,

neglectful supervision, and drug use by Jane. Upon receipt of the report, Diana Villarreal, an investigator for the Department, met with R.S. and R.S. Jr. Upon meeting with the children, Villarreal noticed that the children had a "severe lice problem," a "foul odor," and "a problem with their dental hygiene." Villarreal testified that R.S. and R.S. Jr. told her that they could not remember the last time they had showered and that "the only person that had a toothbrush was the father." Following Villarreal's meeting with the children, Jane submitted to a drug test and tested positive for cocaine.

In January 2007, the Department received another referral pertaining to Jane when A.S. tested positive for cocaine at birth. Instead of removing the children from Jane and taking them into custody, the Department opened a family-based services case, and Jane voluntarily placed the children with her mother. Villarreal testified that Jane complied with some of the services and that the children were returned to her care.

Rosemary Puerto, the nurse at R.S. and R.S. Jr.'s elementary school, testified that the children attended her school from January 2007 until December 2007. Puerto testified that R.S. and R.S. Jr. often arrived late to school and came to her office where she fed them breakfast. Puerto stated that the children's immunization records were not up-to-date and that the children had "very, very bad hygiene," were not bathed regularly, and always wore dirty clothes. Puetro also testified that R.S.'s lice problem was "very severe" and that "you would literally see them [lice] crawling, you know, the little bugs coming out of her hair."

Thelma Caesar, the director of a daycare attended by all five children, also testified about the children's poor hygiene. She stated that the children had head lice and that the problem was "more severe" than a typical lice problem. Caesar also stated that when C.S. took off his shoes "the odor was so bad" that "[t]he first time, I didn't even know what it was

and then the children said it was his socks that was [sic] smelling." Caesar further testified that A.S. had diaper rash, blisters on her bottom, and "was not fresh." The daycare staff "would take the wippies [sic] . . . and wipe [A.S.] down each day because of the—of her not being clean."

Loerna Huerta, an investigator for the Department, testified that in October 2007, the Department received a third and fourth referral. The third referral alleged that R.S. had lice and open sores on her head from the lice. The fourth referral stated that R.S. had a "severe case of head lice" and that Jane had done nothing to treat it. The fourth referral also stated that R.S. Jr. "had a deformity on his head." Huerta testified that she visited R.S. and R.S. Jr. the day the Department received the referrals. Huerta stated that she observed open sores, dried blood, lice, and lice eggs on R.S.'s head. She also noticed a bump on R.S. Jr.'s head, and the children told her that they sometimes went to bed hungry.

After meeting with the children, Huerta went to the home that the children shared with Jane and their father. Huerta spoke to the father and, apparently knowing that the family had recently received food stamps, asked why there was no food in the home. The father told Huerta that there was no food because "the kids ate a lot." Huerta testified that the house was "a little bit filthy" and "needed to be cleaned up." The children were removed from the home in November 2007, when Jane again tested positive for cocaine.

Pavelka testified that, at the time of trial, all five children were living together with a foster family and "appear[ed] to be doing great." Pavelka testified that the children were safe and all of their scholastic and medical needs were being met. Pavelka opined that termination of Jane's parental rights would likely be devastating to R.S., R.S. Jr., and C.S., but that B.S. and A.S. "ha[d] adjusted well emotionally to their situation because they [are] so young."

8

Jane testified that she attempted to treat R.S.'s lice and that her children did not go to school dirty and hungry. Jane testified that she completed parenting classes but was unable to attend or complete any other type of counseling because of scheduling problems. Although Jane admits that she has used cocaine, she does not feel that she has a drug problem. Jane also testified that she did not complete the services because she "didn't feel like [she] needed to go to counseling or to—to the drug assessments or anything like that." Moreover, Jane testified that her contact with her children since their placement in foster care has been minimal because of transportation problems.

On appeal, Jane argues that she is a young mother who "made some mistakes" but "has taken steps to make her life better for both herself and for her children." However, evidence presented at trial revealed that Jane failed to comply with the court-ordered service plan and continued to use drugs. Pavelka testified that in January 2008, the trial court adopted a family-service plan, whereby Jane was supposed to participate in individual and family counseling as well as parenting classes. Testimony revealed that Jane was referred to the Texas Council on Alcohol and Drug Abuse ("TCADA") and recommended for substance abuse treatment for marihuana. A permanency plan report filed in May 2008, states that Jane had not completed a drug assessment, a psychological exam, or individual counseling. A January 2009 permanency plan report states that although Jane completed parenting classes, she failed to implement what she learned.

Furthermore, Pavelka testified that prior to the removal of the children, Jane was drug tested five times and tested positive four times. After removal, Jane was drug tested eighteen times, tested positive eight times, and missed or refused to submit four times. In January 2009, Jane tested positive for cocaine, and in February 2009, approximately one month before the bench trial, Jane tested positive for hydrocodone, a controlled

9

substance for which she presented no prescription.  Jane does not challenge the accuracy of the drug test results and maintains that she was only a casual user.

### 3. Parental abilities of the person seeking custody; available assistance programs

Jane argues that she is able to care for her children because she has a home in which she has resided the past six months and has maintained her current job for eight months.  However, Pavelka testified that Jane has lived in approximately six different residences since November 2007.  Pavelka also testified that she attempted to visit Jane's current residence but that Jane's boyfriend would not allow her to enter the home.  Pavelka stated that domestic violence was a concern when she visited Jane's residence.  Although she was unable to visit the interior of Jane's current home, Pavelka stated that, over the past year, she has been able to visit other homes that Jane resided in and that the homes contained very little furniture and were "not the cleanest."

Pavelka testified that in November 2007, Jane and her family created a service plan that offered individual and family counseling, a psychological evaluation, referral to TCADA for a drug assessment, and parenting classes.  The court adopted the service plan in January 2008.  Testimony revealed that Jane attended two counseling sessions, participated in a drug assessment, and completed parenting classes.  After attending two counseling sessions, Jane "no-showed" for two classes and then failed to return.  The January 23, 2009 permanency plan report states that Jane has not demonstrated that she benefitted from the counseling sessions.  Testimony also reveals that although Jane participated in a drug assessment, she failed to attend the recommended drug counseling.  Moreover, although Jane completed parenting classes, the January 23, 2009 permanency plan report states that she has failed to implement what she learned.  Thus, although more

than a year has passed, Jane has failed to fully comply with these court-ordered services.

### 4. Plans for the children by those individuals or by the agency seeking custody; stability of the home or proposed placement

On appeal, Jane argues that her parental rights should not be terminated because B.G., the children's grandmother, "is still a viable option to take care of her five grandchildren, and she is still available to assist [Jane] in taking care of her five children." Although the Department placed the children with B.G. from January 2008 until August 2008, B.G. informed the Department, in May 2008, that she could not handle all five children. Therefore in October 2008, the Department placed all five children with a foster family. Pavelka testified, at the time of trial, that Garcia was no longer a viable placement option, and that despite a diligent search, the Department had not been able to secure another relative placement.

Pavelka testified that since being placed with the foster family, the children have not had lice, A.S. has been potty trained and has learned to walk, B.S. has begun to talk "a lot more," C.S. has "really com[e] into his own," and R.S. and R.S. Jr. have performed well in school. The permanency plan is for unrelated adoption. Pavelka testified that the permanency plan was developed due to Jane's inability to maintain a stable living environment, concerns regarding domestic violence in Jane's current relationship, and continual positive drug test results.

Although parental rights are of constitutional magnitude, they are not absolute. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.* Viewing the evidence in the light most favorable to the findings, we conclude that a

11

reasonable fact finder could have formed a firm belief that termination of Jane's parental rights was in the childrens' best interest. *See In re J.L.*, 163 S.W.3d at 85. Furthermore, we conclude that the evidence was factually sufficient because the disputed evidence contrary to the findings was not so significant that the trial court could not have formed such a firm conviction or belief. *See In re H.R.M.*, 209 S.W.3d at 108. Accordingly, Jane's sole issue is overruled.

## IV. CONCLUSION

The judgment of the trial court is affirmed.

ROGELIO VALDEZ,
Chief Justice

Delivered and filed the
11th day of March, 2010.